Citation Nr: 1334643 
Decision Date: 10/30/13 Archive Date: 11/06/13

DOCKET NO. 09-42 266 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Louisville, Kentucky


THE ISSUES

1. Entitlement to an effective date prior to January 21, 2009 for the grant of service connection for residuals of traumatic brain injury.

2. Entitlement to an initial rating in excess of 10 percent for residuals of traumatic brain injury. 


REPRESENTATION

Appellant represented by: Military Order of the Purple Heart of the U.S.A.


WITNESS AT HEARING ON APPEAL

The Veteran



ATTORNEY FOR THE BOARD

J.M. Seay, Counsel


INTRODUCTION

The Veteran had active service from March 2000 to January 2004.

These matters come before the Board of Veterans' Appeals (Board) from a March 2009 rating decision of the Louisville, Kentucky, Regional Office (RO) of the Department of Veterans Affairs (VA) that granted service connection for residuals of traumatic brain injury and assigned a noncompensable initial rating, effective from January 21, 2009.

In a September 2009 rating decision, the RO granted a 10 percent increased initial rating for residuals of traumatic brain injury, effective from January 21, 2009. Thus the issue has been characterized as it appears on the first page of this decision, and the Veteran's claim remains on appeal. AB v. Brown, 6 Vet. App. 35 (1993) (in an appeal in which the veteran expresses general disagreement with the assignment of a particular rating and requests an increase, the RO and the Board are required to construe the appeal as an appeal for the maximum benefit allowable by law or regulation).

The Veteran testified at a videoconference hearing before the undersigned Veterans Law Judge in May 2011. A transcript of the hearing is included in the claims folder.

In August 2011, the Board issued a decision which denied the issues herein on appeal. Thereafter, the Veteran appealed the Board's decision to the United States Court of Appeals for Veterans Claims (Court). In October 2012, based on a Joint Motion for an Order Vacating and Remanding, in part, the decision of the Board (Joint Motion), the Court issued an Order vacating and remanding the issues of entitlement to an initial rating in excess of 10 percent for residuals of traumatic brain injury and entitlement to an effective date prior to January 21, 2009, for the grant of service connection for residuals of traumatic brain injury, for compliance with the Joint Motion. In April 2013, the Veteran was sent a letter wherein he was notified of the Court's order and that he had 90 days to submit additional argument or evidence. The Veteran's representative submitted a Hearing Memorandum dated August 15, 2013 and stated that the earlier arguments were incorporated herein by reference and the office had no additional presentation to submit. 

The Board is cognizant of the ruling of the United States Court of Appeals for Veterans Claims (Court) in Rice v. Shinseki, 22 Vet. App. 447 (2009). In Rice, the Court held that a claim for a total rating based on individual unemployability (TDIU) due to service-connected disability, either expressly raised by the Veteran or reasonably raised by the record, involves an attempt to obtain an appropriate rating for a disability and is part of the claim for an increased rating. In this case, the Veteran has not argued, and the record does not otherwise reflect, that the disability at issue renders him unemployable. Accordingly, the Board concludes that a claim for a TDIU has not been raised.

In August 2011, the Board also remanded the issues of entitlement to an effective date prior to October 15, 2009 for the grant of service connection for an adjustment disorder and the issue as to whether there was clear and unmistakable error in a May 2004 rating decision that denied service connection for a psychiatric disability, however diagnosed, to include posttraumatic stress disorder (PTSD), to issue a statement of the case (SOC). See Manlincon v. West, 12 Vet. App. 238 (1999). The RO issued a Statement of the Case in August 2011 and the Board's remand directive was completed. See 38 U.S.C.A. § 5103A(b); Stegall v. West, 11 Vet. App. 268 (1998). The Veteran did not appeal the issues and, therefore, the issues are not before the Board.


FINDINGS OF FACT

1. The most probative evidence of record establishes that, throughout the rating period on appeal, the service-connected residuals of traumatic brain injury have been manifested by three or more subjective symptoms that mildly interfere with daily living-mild memory loss, headaches, and dizziness; he receives separate compensable ratings for tinnitus and a chronic adjustment disorder.

2. The Veteran's original claim of service connection for blackouts was denied by the RO in a May 2004 rating decision; he did not file a notice of disagreement with this decision, and there has been no adjudicatory finding of clear and unmistakable error in that decision.

3. The Veteran's claim for service connection for residuals of traumatic brain injury was received by the RO on January 21, 2009.


CONCLUSIONS OF LAW

1. The criteria for an effective date prior to January 21, 2009 for the grant of service connection for residuals of traumatic brain injury have not been met. 38 U.S.C.A. §§ 5103, 5103A, 5107, 5110 (West 2002); 38 C.F.R. §§ 3.159, 3.114, 3.400 (2013).

2. The criteria for an initial rating in excess of 10 percent for residuals of traumatic brain injury have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.159, 4.21, 4.124a, Diagnostic Code 8045 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veterans Claims Assistance Act of 2000 (VCAA) describes VA's duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2013).

Duty to Notify

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative, if any, of any information and any medical or lay evidence that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. VCAA notice should be provided to a claimant before the initial unfavorable decision by the agency of original jurisdiction on a claim. Pelegrini v. Principi, 18 Vet. App. 112 (2004); Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

The appeal for a higher initial disability rating for the service-connected residuals of traumatic brain injury (TBI) and entitlement to an effective date prior to January 21, 2009, for the grant of service connection for residuals of TBI, arises from a disagreement with the initial rating and effective date assigned following the grant of service connection for residuals of TBI. In this regard, because the March 2009 rating decision granted the Veteran's claim of entitlement to service connection, the claim is now substantiated. His filing of a notice of disagreement as to the initial rating and effective date assigned does not trigger additional notice obligations under 38 U.S.C.A. § 5103(a). 38 C.F.R. § 3.159(b)(3) (2013). Rather, the Veteran's appeal as to the initial rating assignment and effective date triggers VA's statutory duties under 38 U.S.C.A. §§ 5104 and 7105, as well as regulatory duties under 38 C.F.R. § 3.103. Under 38 U.S.C.A. § 7105(d), upon receipt of a notice of disagreement in response to a decision on a claim, the agency of original jurisdiction must take development or review action it deems proper under applicable regulations and issue a statement of the case if the action does not resolve the disagreement either by grant of the benefits sought or withdrawal of the notice of disagreement. However, section 5103(a) does not require VA to provide notice of the information and evidence necessary to substantiate the newly raised issue. See VAOPGCPREC 8-03 (December 22, 2003); 69 Fed. Reg. 25180 (2004); 38 C.F.R. § 3.159(b)(3) (2013).

As a consequence, VA is only required to advise the Veteran of what is necessary to obtain the maximum benefit allowed by the evidence and the law. This has been accomplished here. A statement of the case (SOC), under the heading "Pertinent Laws; Regulations; Rating Schedule Provisions," set forth the relevant diagnostic code for rating the disability at issue, and included a description of the rating formulas for all possible schedular ratings under this diagnostic code. The Veteran was thus informed of what was needed not only to achieve the next higher schedular rating, but also to obtain all schedular ratings above the initial rating that the RO assigned. Therefore, the Board finds that the Veteran has been informed of what was necessary to achieve a higher rating for the service-connected residuals of TBI. A SOC issued with respect to the Veteran's claim for an earlier effective date set forth the relevant regulations for the assignment of effective dates. Although the statement of the case did not apprise the Veteran of the provisions of 38 C.F.R. § 3.114, the Board finds the Veteran has not been prejudiced in this regard. Statements on appeal from the Veteran and his representative, including in the Joint Motion, reflect actual acknowledge of such provisions. Therefore, the Board finds that the Veteran was informed, or otherwise aware of, what was needed to achieve an earlier effective date. 

Duty to Assist

The duty to assist the Veteran has also been satisfied in this case. The service treatment records and VA medical treatment and clinical assessment records have been obtained and associated with the claims file. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. 

The Veteran was afforded VA examinations in February 2009 and October 2010. To that end, when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The examiners performed examinations of the Veteran, considered the Veteran's reported symptomatology, and provided the medical information necessary to address the rating criteria in this case. See generally Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008). Thus, the examinations are adequate. In addition, there is no objective evidence indicating that there has been a material change in the severity of the Veteran's service-connected disability since he was last examined. 38 C.F.R. § 3.327(a). The duty to assist does not require that a claim be remanded solely because of the passage of time since an otherwise adequate VA examination was conducted. VAOPGCPREC 11-95. Accordingly, the Board finds that VA's duty to assist with respect to obtaining a VA examination or opinion regarding the issue on appeal has been met. 38 C.F.R. § 3.159(c)(4).

In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Court held that 38 C.F.R. § 3.103(c)(2) requires that the VLJ who conducts a hearing fulfill two duties to comply with the above regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. During the hearing, the Veteran was assisted at the hearing by an accredited representative from the Military Order of the Purple Heart. The VLJ explained the issues on appeal and sought testimony from the Veteran regarding the claim of entitlement to an earlier effective date for the grant of residuals of TBI and entitlement to an increased rating for residuals of TBI. The representative and the VLJ asked questions to ascertain the nature and severity of the Veteran's service-connected disability and his claim for an earlier effective date. The VLJ solicited information on the availability of any additional relevant evidence for development. Specifically, the VLJ asked the Veteran whether the Veteran was treated by any other medical provider, other than the Louisville, Kentucky VA Medical Center, and asked the Veteran whether there were any private treatment records. The Veteran responded that there were no private records. No additional pertinent evidence that might have been overlooked and that might substantiate the claims was identified by the Veteran or the representative. Neither the representative nor the Veteran has suggested any deficiency in the conduct of the hearing. Therefore, the Board finds that, consistent with Bryant, the VLJ complied with the duties set forth in 38 C.F.R. § 3.103(c)(2).

Earlier Effective Date

In general, the assignment of effective dates of awards is governed by 38 U.S.C.A. § 5110 and 38 C.F.R. § 3.400. Generally, the effective date of an evaluation and award of pension, compensation, or dependency and indemnity compensation based on an original claim, a claim reopened after final disallowance, or a claim for increase will be the date of receipt of the claim or the date entitlement arose, whichever is later. 38 U.S.C.A. § 5110(a) (West 2002); 38 C.F.R. § 3.400 (2013).

In February 2004, the Veteran filed his original claim of service connection for blackouts. In a May 2004 rating decision, the RO denied the claim. The Veteran did not appeal the decision and there has been no adjudicatory finding of CUE as to that determination and the Veteran has not raised the issue of CUE. Therefore, the decision is final. See 38 U.S.C.A. § 7105 (West 2002); 38 C.F.R. §§ 20.302, 20.1103 (2012).

On January 21, 2009, the Veteran filed a claim for service connection for residuals of traumatic brain injury, including dizziness and memory loss. As noted above, the March 2009 rating decision on appeal, granted service connection for residuals of traumatic brain injury, effective January 21, 2009, the date the claim was received, in accordance with 38 U.S.C.A. § 5110(a) and 38 C.F.R. § 3.400. There are no earlier documents or communication in the claims file dated between the May 2004 rating decision and the Veteran's January 2009 claim that may be construed as an informal claim for the purpose of assigning an earlier effective date for the grant of service connection.

In accordance with the applicable regulations dealing with the assignment of effective dates, January 21, 2009 is the earliest date for the grant of service connection and payment of compensation that may be awarded. Consequently, this is the earliest date that may be assigned for the grant of service connection for residuals of traumatic brain injury, either on the basis of a new claim or on the receipt of new and material evidence to reopen the claim. See 38 C.F.R. § 3.400.

To the extent that the Veteran and his representative assert that the Veteran is entitled to an effective date from the date of his initial claim for service connection for blackouts, the Board reiterates that this claim was denied by the RO in a May 2004 rating decision. The Veteran did not appeal this decision and there has been no adjudicatory finding of CUE in that decision. Hence, it is final. 38 U.S.C.A. § 7105 (West 2002). The Court has clearly held that there is no basis in VA law for a freestanding earlier effective date claim in matters addressed in a final decision. Rather, when a decision is final, only a request for a revision premised on clear and unmistakable error could result in the assignment of an earlier effective date. See Rudd v. Nicholson, 20 Vet. App. 296 (2006). Consequently, the Board concludes that the attempt to overcome finality of the RO's May 2004 rating decision in raising a freestanding claim for entitlement to an earlier effective date in conjunction with this claim must fail. As noted above, the Board's finding in this regard does not prejudice any future adjudication of a raised issue of CUE in the May 2004 rating decision which denied service connection for blackouts, to include as a residual of traumatic brain injury.

Finally, the Board will address the argument that the Veteran is entitled to an earlier effective date of October 23, 2008, as a result of the revision to the Rating Schedule pertaining to the Residuals of TBI. The revision was effective October 23, 2008. In the Joint Motion, the parties asserted that the revision to the Rating Schedule was a liberalizing law and that the Board erred by not addressing the propriety of application of 38 C.F.R. § 3.114(a) (2013) in determining whether an effective date prior to January 21, 2009 was warranted for the award of service connection for the disability at issue.

The stated summary of the amendment noted that the document "amends the Department of Veterans Affairs (VA) Schedule by revising the portion of the Schedule that addresses neurological conditions and convulsive disorders. The effect of this action is to provide detailed and updated criteria for evaluating residuals of traumatic brain injury (TBI)." See 73 Fed. Reg. 54,693 (Sept. 23, 2008). 

The amendment states that: 

 "[t]he effective date of any award, or any increase in disability compensation, based solely on these new rating criteria will not be earlier than the effective date of this rule, but will otherwise be assigned under the current regulations governing effective dates, 38 CFR 3.400, etc." Id. 

The provisions of 38 C.F.R. § 3.114(a) state that: 

"[w]here pension, compensation, dependency and indemnity compensation, or a monetary allowance under 38 U.S.C. chapter 18 for an individual who is a child of a Veteran veteran or child of a veteran with covered service in Korea is awarded or increased pursuant to a liberalizing law, or liberalizing VA issue approved by the Secretary or by the Secretary's direction, the effective date of such award or increase shall be fixed in accordance with the facts found, but shall not be earlier than the effective date of the act or administrative issue."

". . . in order for a claimant to be eligible for a retroactive payment under the provisions of this paragraph the evidence must show that the claimant met all eligibility criteria for the liberalized benefit on the effective date of the liberalizing law or VA issue and that such eligibility existed continuously from that date to the date of claim or administrative determination of entitlement." 

The Board has considered the propriety of application of 38 C.F.R. § 3.114(a) (2013), as directed by the Court. However, the Board rejects the argument that the Veteran is entitled to an effective date earlier than January 21, 2009.

The Veteran's representative contended that the purpose of the amendment to VA's Rating schedule, specifically, Diagnostic Code 8045, was to allow for service connection for residuals of traumatic brain injury that had not been accounted for prior to its enactment. The representative stated that the revision changed the criteria for service connection by greatly expanding the list of symptoms that show that the Veteran has a disability and that VA provided new guidelines to its medical professionals who evaluate veterans for service connection for residuals of traumatic brain injury by creating a new examination worksheet solely for evaluating whether a Veteran is entitled to service connection for the residuals of traumatic brain injury. 

While the Board agrees that the revision to the Rating Schedule was a liberalizing law for the purposes of those seeking increased ratings for their already service-connected residuals of traumatic brain injuries, the Board does not agree that the revision is liberalizing with respect to claimants who were seeking service connection. As shown by the above, the amendment itself indicated the purpose of the amendment was to revise the Rating Schedule to "provide detailed and updated criteria for evaluating residuals of traumatic brain injury (TBI)." Moreover, 38 C.F.R. § 4.124a, Diagnostic Code 8045, specifically states: "for the purposes of determining the effective date of an increased rating awarded as a result of such review, VA will apply 38 C.F.R. § 3.114, if applicable.." There is no indication that the provisions of 38 C.F.R. § 3.114 apply to the assignment of effective dates for original grants of service connection for residuals of traumatic brain injury. That the worksheets may have been revised as a result of the revision to the Rating Schedule does not alter the general rules regarding effective dates for the grants of service connection. Indeed, worksheets are revised periodicially, as seen by the revised worksheets for hearing loss. See Revised Disability Examination Worksheets, Fast Letter 07-10 (Dep't of Veterans Affairs Veterans Apr. 24, 2007). The revisions to the Rating Schedule were intended to provide detailed and updated criteria. While the revisions may have had the effect of improving diagnosis and identifying symptoms with respect to traumatic brain injuries, the Board does not find that they changed or redefined what constitutes a traumatic brain injury as a current disability criteria for service connection. Further, the provisions of 38 C.F.R. § 4.124a, Diagnostic Code 8045, direct consideration of § 3.114 in the context of an increased rating claim, which is not the case here. As a result, the earliest effective date that can be assigned is January 21, 2009. 

The Board finds that the preponderance of the evidence is against the Veteran's claim for the award of an effective date earlier than January 21, 2009 for the disability at issue, and the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. 

Initial Rating

Disability ratings are determined by the application of the VA's Schedule for Rating Disabilities (Schedule), which is based on the average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4 (2013). Pertinent regulations do not require that all cases show all findings specified by the Schedule, but that findings sufficient to identify the disease and the resulting disability and above all, coordination of the rating with impairment of function will be expected in all cases. 38 C.F.R. § 4.21 (2013); see also Mauerhan v. Principi, 16 Vet. App. 436 (2002).

The primary concern in a claim for an increased evaluation for service-connected disability is the present level of disability. However, a disability must be evaluated "in relation to its history." 38 C.F.R. § 4.1 (2013). 

VA has a duty to consider the possibility of assigning staged ratings in all claims for increase. See Hart v. Mansfield, 21 Vet. App. 505 (2007); Fenderson v. West, 12 Vet. App. 119 (1999). 

Residual disability of traumatic brain injury is rated under 38 C.F.R. § 4.124a, Diagnostic Code 8045. The protocol for rating TBI residuals was revised effective October 23, 2008. See 73 Fed. Reg. 54,693 (Sept. 23, 2008). Since the Veteran's claim was received in January 2009, and the effective date assigned for the award of service connection, as upheld herein, is January 21, 2009, the revised regulations are to be applied.

Revised Diagnostic Code 8045 states that there are three main areas of dysfunction that may result from traumatic brain injuries and have profound effects on functioning: cognitive (which is common in varying degrees after a traumatic brain injury), emotional/behavioral, and physical. Each of these areas of dysfunction may require evaluation. 38 C.F.R. § 4.124a, Diagnostic Code 8045 (2013).

Cognitive impairment is defined as decreased memory, concentration, attention, and executive functions of the brain. Executive functions are goal setting, speed of information processing, planning, organizing, prioritizing, self-monitoring, problem solving, judgment, decision making, spontaneity, and flexibility in changing actions when they are not productive. Not all of these brain functions may be affected in a given individual with cognitive impairment, and some functions may be affected more severely than others. In a given individual, symptoms may fluctuate in severity from day to day. Evaluate cognitive impairment under the table titled "Evaluation of Cognitive Impairment and Other Residuals of Traumatic Brain Injury Not Otherwise Classified."

Subjective symptoms may be the only residual of a traumatic brain injury or may be associated with cognitive impairment or other areas of dysfunction. Evaluate subjective symptoms that are residuals of a traumatic brain injury, whether or not they are part of cognitive impairment, under the subjective symptoms facet in the table titled "Evaluation of Cognitive Impairment and Other Residuals of Traumatic Brain Injury Not Otherwise Classified." However, separately evaluate any residual with a distinct diagnosis that may be evaluated under another diagnostic code, such as migraine headache or Meniere's disease, even if that diagnosis is based on subjective symptoms, rather than under the "Evaluation of Cognitive Impairment and Other Residuals of Traumatic Brain Injury Not Otherwise Classified" table.

Evaluate emotional/behavioral dysfunction under § 4.130 (Schedule of ratings-mental disorders) when there is a diagnosis of a mental disorder. When there is no diagnosis of a mental disorder, evaluate emotional/behavioral symptoms under the criteria in the table titled "Evaluation of Cognitive Impairment and Other Residuals of Traumatic Brain Injury Not Otherwise Classified."

Evaluate physical (including neurological) dysfunction based on the following list, under an appropriate diagnostic code: motor and sensory dysfunction, including pain, of the extremities and face; visual impairment; hearing loss and tinnitus; loss of sense of smell and taste; seizures; gait, coordination, and balance problems; speech and other communication difficulties, including aphasia and related disorders, and dysarthria; neurogenic bladder; neurogenic bowel; cranial nerve dysfunctions; autonomic nerve dysfunctions; and endocrine dysfunctions.

The preceding list of types of physical dysfunction does not encompass all possible residuals of a traumatic brain injury. For residuals not listed here that are reported on an examination, evaluate under the most appropriate diagnostic code. Evaluate each condition separately, as long as the same signs and symptoms are not used to support more than one evaluation, and combine under § 4.25 the evaluations for each separately rated condition. The evaluation assigned based on the "Evaluation of Cognitive Impairment and Other Residuals of Traumatic Brain Injury Not Otherwise Classified" table will be considered the evaluation for a single condition for purposes of combining with other disability evaluations.

Consider the need for special monthly compensation for such problems as loss of use of an extremity, certain sensory impairments, erectile dysfunction, the need for aid and attendance (including for protection from hazards or dangers incident to the daily environment due to cognitive impairment), being housebound, etc. Evaluation of Cognitive Impairment and Subjective Symptoms: The table titled "Evaluation of Cognitive Impairment and Other Residuals of Traumatic Brain Injury Not Otherwise Classified" contains 10 important facets of a traumatic brain injury related to cognitive impairment and subjective symptoms. It provides criteria for levels of impairment for each facet, as appropriate, ranging from 0 to 3, and a 5th level, the highest level of impairment, and labeled "total." However, not every facet has every level of severity. The Consciousness facet, for example, does not provide for an impairment level other than "total," since any level of impaired consciousness would be totally disabling. Assign a 100 percent evaluation if "total" is the level of evaluation for one or more facets. If no facet is evaluated as "total," assign the overall percentage evaluation based on the level of the highest facet as follows: 0 = 0 percent; 1 = 10 percent; 2 = 40 percent; and 3 = 70 percent. For example, assign a 70 percent evaluation if 3 is the highest level of evaluation for any facet.

Note (1): There may be an overlap of manifestations of conditions evaluated under the table titled "Evaluation Of Cognitive Impairment And Other Residuals Of Traumatic Brain Injury Not Otherwise Classified" with manifestations of a comorbid mental or neurologic or other physical disorder that can be separately evaluated under another diagnostic code. In such cases, do not assign more than one evaluation based on the same manifestations. If the manifestations of two or more conditions cannot be clearly separated, assign a single evaluation under whichever set of diagnostic criteria allows the better assessment of overall impaired functioning due to both conditions. However, if the manifestations are clearly separable, assign a separate evaluation for each condition.

Note (2): Symptoms listed as examples at certain evaluation levels in the table are only examples and are not symptoms that must be present in order to assign a particular evaluation.

Note (3): "Instrumental activities of daily living" refers to activities other than self-care that are needed for independent living, such as meal preparation, doing housework and other chores, shopping, traveling, doing laundry, being responsible for one's own medications, and using a telephone. These activities are distinguished from "Activities of daily living," which refers to basic self-care and includes bathing or showering, dressing, eating, getting in or out of bed or a chair, and using the toilet.

Note (4): The terms "mild," "moderate," and "severe" traumatic brain injury, which may appear in medical records, refer to a classification of traumatic brain injury made at, or close to, the time of injury rather than to the current level of functioning. This classification does not affect the rating assigned under Diagnostic Code 8045.

Note (5): A veteran whose residuals of a traumatic brain injury are rated under a version of § 4.124a, diagnostic code 8045, in effect before October 23, 2008 may request review under diagnostic code 8045, irrespective of whether his or her disability has worsened since the last review. VA will review that veteran's disability rating to determine whether the Veteran may be entitled to a higher disability rating under Diagnostic Code 8045. A request for review pursuant to this note will be treated as a claim for an increased rating for purposes of determining the effective date of an increased rating awarded as a result of such review; however, in no case will the award be effective before October 23, 2008. For the purposes of determining the effective date of an increased rating awarded as a result of such review, VA will apply 38 CFR 3.114, if applicable. 38 C.F.R. § 4.124a, Diagnostic Code 8045 (2013).


Analysis

The Board has reviewed all of the evidence in the Veteran's claims file, with an emphasis on the evidence relevant to this appeal. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, the extensive evidence of record. Indeed, the Federal Circuit has held that the Board must review the entire record, but does not have to discuss each piece of evidence. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000). Therefore, the Board will summarize the relevant evidence where appropriate, and the Board's analysis below will focus specifically on what the evidence shows, or fails to show, as to the claims.

As noted above, the Veteran has been granted service connection for residuals of a TBI, effective January 21, 2009. Although the Veteran's disability status during the appeal period is for primary consideration, as noted above, and as asserted on appeal, pursuant to the provisions of 38 C.F.R. § 4.1, the history of the disability is for consideration in evaluating the disability at issue. 

On VA neuropsychological evaluation in November 2008, the Veteran was administered multiple tests, including the Memory Assessment Scale, Test of Memory Malingering, and North American Adult Reading Test. Based on this testing, the examiner determined that the Veteran scored in the low average range on testing of verbal memory that involved learning a list of unrelated words over multiple trials. A learning curve was developed over the trials, nevertheless, and his recall of words following a brief interference task placed in the average range. His recall of the words 30 minutes later placed in the high average range. The Veteran accurately selected all 12 of the words when given to him in paired associates, as well as when asked to select them from a long list. On verbal short term memory testing, his recall of prose passage material placed in the average range and fell slightly to the low average range when asked to retrieve the information after 30 minutes. In the area of visual memory, the Veteran scored in the superior range when asked to draw a design from memory immediately, and remained in the superior range when he drew the design from memory 30 minutes later. He scored in the low average range when asked to recognize elements of the figure by selecting them from a multiple choice format. In the area of executive functioning, scores ranged from low average to the high average levels. The examiner reported that the Veteran achieved a low average score on visual screening and tracking task that involved simultaneous double tracking. In the sensorimotor realm of functioning, the Veteran had low average scores on a measure of fine finger dexterity and eye-hand coordination, bilaterally. In conclusion, the examiner reported that the Veteran's performance on memory measures ranged from borderline to superior, with scores clustering in the average range. The examiner further opined that, based on these findings, no residual neurocognitive disturbance of an organic etiology was noted. The Veteran reported he continued to have headaches, although they had diminished in frequency, and had improved with over-the-counter medication. He reported transient dizzy spells, and episodes when his vision was "wavy" momentarily. He reported no balance or coordination problems.

VA treatment records reflect that the Veteran reported cognitive impairment. A January 2009 VA treatment record shows a diagnosis of mild TBI with no current sequlae. A follow-up note stated that the Veteran was informed that his diagnosis of TBI did not limit him in any way in his daily performance. He was informed that his neuropsychology test showed that he did not have any active symptoms of TBI; however, he had a low score on emotional scale. VA treatment records dated April 2009 and May 2009 reflect that the Veteran participated in occupational therapy. An April 2009 VA treatment record shows that the Veteran reported that the GPS was a great help and he had difficulty remembering things. He reported continued difficulty with memory and problem solving. Records also showed that the Veteran complained of headaches and being unable to smell. 

The Veteran was provided a VA examination in February 2009. The Veteran stated that once he was out of the service, he was first seen for his symptoms in 2008. He reported symptoms of insomnia, random headaches and intermittent dizziness. He stated that his dizziness occurred about once per month which was totally random and not related to specific activities. His headaches occurred about twice per month and were random. The severity of the initial injury was mild and the condition stabilized. There was no history of seizures, numbness, paresthesias or other sensory changes; weakness or paralysis; mobility problems; malaise; bowel problems; bladder problems; erectile dysfunction; hypersensitivity to light and sound; vision problems; speech/swallowing difficulty; decreased sense of taste or smell; endocrine dysfunction; or cranial nerve dysfunction. The Veteran had headaches about once every couple of weeks and they lasted for a couple of hours. The headaches did not occur with light or noise sensitivity or nausea/vomiting and do not resemble migraine or cluster but rather tension-type headaches. He stated that he takes OTC Aspirin or Ibuprofen which relieves his pain. The Veteran stated that he had dizziness once or maybe twice per month and this was very brief-lasting a few seconds and he did not take medication for the symptom. The Veteran had normal balance. The Veteran had pain in his posterior to his left ear down lateral neck area which he stated was very rare (occurred two to three times per year) and lasts a couple of seconds and resolves. He reported that he had insomnia and only slept three to four hours for several days and then will have a night where he sleeps very sound for 10 hours. He states he had chronic fatigue from not sleeping that he described as moderate. 

With respect to psychiatric symptoms, he had mood flares of anger and denied anxiety, depression, or mood swings. He had mild memory impairment with cognitive symptoms of difficulty with executive functions. With respect to neurobehavioral symptoms, the Veteran stated that he was irritable but it was not extreme and occurred daily. The Veteran was service-connected for tinnitus and had some mild hearing loss. The findings for the detailed reflex examination were normal (2+) and plantar flexion was normal for left and right. The detailed motor exam revealed findings of 5 (active movement against full resistance). Muscle tone was normal and there was no atrophy. There were no physical findings of autonomic nervous system impairment; gait abnormalities; imbalance or tremors; muscle atrophy or loss of muscle tone; spasticity or rigidity; fasciculations; cranial nerve dysfunction; hearing problems; endocrine dysfunction; skin breakdown; vision problems; cognitive impairment; psychiatric manifestations; or other abnormalities. With respect to cognitive impairment, the examiner noted that the Veteran had a complaint of mild memory loss (such as having difficulty following a conversation, recalling recent conversations, remembering names of new acquaintances, or finding words, or often misplacing items), attention, concentration, or executive functions, but without objective evidence on testing. Judgment was normal, social interaction was routinely appropriate, he was always oriented to person, time, place, and situation, motor activity was normal, and visual spatial orientation was normal. Subjective symptoms did not interfere with work, instrumental activities of daily living; or work, family or other close relationship. The Veteran had one or more neurobehavioral effects that did not interfere with workplace interaction or social interaction. The Veteran was able to communicate by spoken and written language and to comprehend spoken and written language. Consciousness was normal. The Veteran was diagnosed with previous mild TBI; no neurocognitive deficit or disturbance per (November 2008) neuropsychological report, and no current sequelae per polytrauma.

The Veteran was provided a VA examination in October 2010. The claims file was reviewed. The examiner stated that the results of the neuropsychological evaluation indicated that the Veteran's current level of intellectual functioning was average to high average range, consistent with estimates of his premorbid level of intellectual functioning. Performance on memory measures from borderline to the superior range, although scores were clustered in the average range. No significant differences were seen between verbal memory skills and recall of visual stimuli. Contradictory findings were seen on sensorimotor examinations, with his left hand significantly more efficient than his right (dominant) hand on a measure of simple motor speed, although no lateralized differences were seen on a measure of eye hand coordination and fine finger dexterity. These data were not compelling indicators of organic involvement. The Veteran appeared to be undergoing a significant amount of emotional turmoil at this time, characterized by suspiciousness, internalized anger, anxiety, and depression. He was working and seemed established in that job. Based on these findings, there was no residual neurocognitive disturbance of an organic etiology. Cognitive inefficiency reported by the Veteran was most parsimoniously explained by functional factors such as the stressors in his personal life at this time. With respect to medical history, the severity of the initial injury was mild. The Veteran reported that he was slow to process information in the past (February 2004) but has improved. The condition has stabilized. There was no history of: seizures, balance and coordination problems; autonomic dysfunction; numbness; parenthesis or other sensory changes; weakness or paralysis; mobility problems, ambulatory problems, fatigue, malaise, bowel problems, erectile dysfunction; hypersensitivity to light or sound, speech or swallowing difficulty, endocrine dysfunction, or cranial nerve dysfunction. 

With respect to headaches, the Veteran stated that they occur three times per month and lasted all day. He described the pain as "head expanding." The Veteran reported dizziness that occurred sporadically- twice a month. It lasts a few minutes and resolves spontaneously. The Veteran reported severe shooting pain behind left ear, occurred sporadically, less than once a month on average, lasted a few seconds and then resolved. He also had pain in low back, right hip, bilateral knees, and bilateral Achilles tendons. With respect to sleep disturbance, he stated that he goes to sleep by 10 PM and takes a few hours to go to sleep, occasionally mind still racing, sleeps for two to three hours, then takes one hour to go back to sleep and then sleeps until 6 AM. After two weeks of insomnia, he will get 8 hours of sleep. The problems reportedly started after TBI. His psychiatric symptoms reportedly started after TBI. His memory impairment was mild and consisted of difficulty concentrating. His cognitive symptoms included difficulty concentrating. His neurobehavioral symptoms included irritability and he had altercations at work. He had ringing in both ears and hearing was at normal level during last evaluation in August 2003. The Veteran occasionally had tunnel vision- occurred a few times in the past. He had normal vision with no corrective lenses. He reported variable decreased smell- can smell one day and not the next. This is not consistent with a cranial nerve abnormality from a mild brain injury. 

The detailed reflex exam findings were normal (2+). Plantar flexion on the left and right was normal. Sensory exam findings of the upper and lower bilateral extremities were normal. The detailed motor examination findings were normal. There were no physical findings of: autonomic nervous system impairment; gait abnormalities; imbalance or tremors; muscle atrophy or loss of muscle tone; spasticity or rigidity; fasciculations; cranial nerve dysfunction; hearing problems; endocrine dysfunction; skin breakdown; vision problems; psychiatric manifestations; or other abnormalities. 

With respect to cognitive impairment, "SLUMS" was 29/30 - normal range. In regard to memory, attention, concentration, and executive functions, the Veteran had a complaint of mild memory loss (such as having difficulty following a conversation, recalling recent conversations, remembering names or new acquaintances, or finding words, or often misplacing items), attention, concentration, or executive functions, but without objective evidence on testing. Judgment was normal, social interaction was routinely appropriate, the Veteran was always oriented to person, place, time, and situation, and motor activity was normal. Visual spatial orientation was mildly impaired and he occasionally got lost in unfamiliar surroundings and had difficulty reading maps or following directions. He was able to use devices such as GPS (global positioning system). 

With respect to subjective symptoms, the Veteran had three or more subjective symptoms that mildly interfered with work; instrumental activities of daily living, or work, family, or other close relationships. It was noted that examples of findings that might be seen at this level of impairment are: intermittent dizziness, daily mild to moderate headaches, tinnitus, frequent insomnia, hypersensitivity to sound, hypersensitivity to light. The Veteran had one or more neurobehavioral effects that occasionally interfered with workplace interaction, social interaction, or both but did not preclude them. He was able to communicate by spoken and written language and comprehend spoken and written language. His consciousness was normal. The diagnosis was listed as "traumatic brain injury, no cognitive residual per neuropysh[iatric testing]." The examiner commented that the Veteran had a diagnosis of chronic adjustment disorder and based on his previous neuropsychological testing and current SLUMS testing, most of his symptoms are related to his mental health diagnosis. His persistent neurobehavioral symptoms, impaired concentration and memory, sleep disorder, and tension headaches could all be symptoms related to his mental health condition. There were no objective findings on today's or previous testing that there were residuals from his TBI.

After a review of the record, the Board finds that the preponderance of the evidence is against a finding that the Veteran's symptomatology from this disability meets the criteria for a rating in excess of 10 percent. (The Board observes that the Veteran has established service connection for tinnitus, rated 10 percent disabling and an adjustment disorder, rated 30 percent disabling). 

First, with respect to emotional functioning, service connection is already in effect for chronic adjustment disorder. Emotional/behavior dysfunction resulting from TBI is to be rated under the same schedule for mental disorders which is already covered by the Veteran's separate rating for chronic adjustment disorder. Accordingly, the Board will not discuss emotional functioning herein and will restrict its discussion and analysis to the Veteran's cognitive dysfunction and physical dysfunction.

First, with respect to cognitive impairment and other residuals of TBI not otherwise classified, the Veteran does not meet impairment levels 2 or higher. 

With respect to the memory facet, impairment levels 2 and higher require objective evidence of impairment of memory, attention, concentration, and executive functions resulting in mild or worse functional impairment. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). VA treatment records reflect that the Veteran reported memory impairment. However, on VA examinations in February 2009 and October 2010, the Veteran's memory was evaluated as no worse than "mild." Specifically, the February 2009 and October 2010 VA examiners characterized the memory loss as mild (such as having difficulty following a conversation, recalling recent conversations, remembering names of new acquaintances, or finding words, or often misplacing items), attention, concentration, or executive functions, but without objective evidence on testing. Both examiners indicated that there was no neurocognitive disturbance from the Veteran's previous mild TBI. Such findings were consistent with his medical history as noted on VA examination in November 2008. Therefore, the Veteran's memory has not been impaired to a level of 2 or greater at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the judgment facet, impairment level 2 requires moderately impaired judgment. For complex or unfamiliar decisions, usually unable to identify, understand, and weigh the alternatives, understand the consequences of choices, and make a reasonable decision, although has little difficulty with simple decisions. Accordingly, the Veteran's judgment has not been shown to be impaired to a level of 2 or greater at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the social interaction facet, impairment level 2 requires social interaction that is frequently inappropriate. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The record reflects that the Veteran has impairment in social interaction; however, the VA examiners have described the Veteran's social interaction as "routinely appropriate." Accordingly, the evidence reflects that the Veteran's social interaction has not been impaired to a level of 2 at any point during the period on appeal because it is not shown to be frequently inappropriate. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the orientation facet, impairment level 2 requires that the Veteran be occasionally disoriented to two of the four aspects (person, time, place, situation) or orientation or often disoriented to one aspect or orientation. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The medical evidence shows that the Veteran has been oriented to all four aspects. The February 2009 and October 2010 VA examiners noted that the Veteran was "always oriented" to person, time, place, and situation. Accordingly, the Veteran's orientation has not been impaired to a level of 2 or greater at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the motor activity facet, impairment level 2 requires that motor activity be mildly decreased or with moderate slowing due to apraxis. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The medical evidence of record does not show that the Veteran had ever had motor activity which was decreased. Accordingly, the Veteran's motor activity has not been impaired to a level of 2 or greater at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the visual spatial orientation facet, impairment level 2 requires that visual spatial orientation be moderately impaired. Moderate impairment is defined as usually gets lost in unfamiliar surroundings, has difficulty reading maps, following directions, and judging distance. He has difficulty using assistive devices such as GPS. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The October 2010 VA examiner commented that the Veteran "occasionally got lost in unfamiliar surroundings and had difficulty reading maps or following directions," which is consistent with impairment level 1. The examiner stated that the Veteran was able to use assistive devices such as GPS. Accordingly, the Veteran's visual spatial orientation has not been impaired to a level of 2 or greater at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the subjective symptoms facet, level 2 is the highest level of impairment for which a rating can be assigned. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). To warrant an impairment rating of level 2, the record must reflect three or more subjective symptoms that moderately interfere with work; instrumental activities of daily living; or work, family, or other close relationships. Examples of findings that may be seen at this level of impairment are: marked fatigability, blurred or double vision, headaches requiring rest periods during most days. Here, the February 2009 VA examiner commented that the Veteran's symptoms did not interfere with work; instrumental activities of daily living; or work, family, or other close relationships (level 0 impairment). The October 2010 VA examiner stated that the Veteran's symptoms mildly interfered with work; instrumental activities of daily living; or work, family, or other close relationships. Accordingly, an impairment rating of level 1 or greater cannot be assigned for the Veteran's subjective symptoms.

For the neurobehavioral effects facet, impairment level 2 requires one or more neurobehavioral effects that frequently interfere with workplace interaction, social interaction, or both but do not preclude them. Examples of neurobehavioral effects are irritability, impulsivity, unpredictability, lack of motivation, verbal aggression, physical aggression, belligerence, apathy, lack of empathy, moodiness, lack of cooperation, inflexibility, and impaired awareness of disability. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The February 2009 VA examiner stated that the Veteran had one or more neurobehavioral effects that did not interfere with workplace interaction or social interaction. The October 2010 VA examiner explained that the Veteran had one or more neurobehavioral effects that occasionally interfered with workplace interaction, social interaction, or both but do not preclude them. Accordingly, the neurobehavioral effects have not resulted in impairment to a level of 2 at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the communication facet, impairment level 2 requires an inability to communicate either by spoken language, written language, or both, more than occasionally but less than half of the time, or to comprehend spoken language, written language, or both, more than occasionally but less than half of the time. Can generally communicate complex ideas. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The evidence of record does not show that the Veteran has ever had any impairment of communication which is analogous to a Level 2 impairment. Specifically, the VA examiners indicated that the Veteran was able to communicate by spoken and written language and comprehend spoken and written language. Accordingly, the Veteran's communication has not been impaired to a level of 3 or greater at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

For the consciousness facet, the only impairment contemplated by the Cognitive Impairment Table is total impairment, which requires a persistently altered state of consciousness, such as vegetative state, minimally responsive state, or coma. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013). The evidence of record demonstrates that the Veteran has never been in a persistently altered state of consciousness at any point during the period on appeal, let alone one analogous to a vegetative state, minimally responsive state, or coma. Accordingly, the Veteran's consciousness has not been impaired at any point during the period on appeal. 38 C.F.R. § 4.124a, Cognitive Impairment Test (2013).

With respect to any physical dysfunction, the Board notes that the Veteran has been assigned a separate disability rating for tinnitus. There is no indication of any compensable bilateral hearing loss in the record. Although the February 2009 VA examiner indicated that the Veteran reported a mild hearing loss, the February 2009 VA examiner subsequently noted that there were no physical findings of: autonomic nervous system impairment, gait abnormalities; imbalance of tremors; muscle atrophy or loss of muscle tone, spasticity or rigidity; fasciculations; cranial nerve dysfunction, hearing problems, endocrine dysfunction, skin breakdown, visual problems, or other abnormalities. The October 2010 VA examiner explained that the Veteran's hearing loss was at a normal level when last evaluated. The October 2010 examiner stated that there were no physical findings of: autonomic nervous system impairment, gait abnormalities; imbalance of tremors; muscle atrophy or loss of muscle tone, spasticity or rigidity; fasciculations; cranial nerve dysfunction, hearing problems, endocrine dysfunction, skin breakdown, visual problems, or other abnormalities. 

The Board notes that the Veteran complained of a loss of sense of smell during his October 2010 VA examination. A separate 10 percent rating may be assigned for complete loss of sense of smell or complete loss of sense of taste, under Diagnostic Codes 6275 or 6276, respectively. 38 C.F.R. § 4.87a (2013). However, the Veteran did not report a complete loss of sense of smell. In addition, the October 2010 VA examiner explained that the Veteran's variable decreased sense of smell was not consistent with a cranial nerve abnormality from a mild brain injury. Therefore, separate ratings for decreased sense of smell/taste are not warranted. 

The Veteran has also reported experiencing headaches. The February 2009 VA examination report shows that the Veteran reported headaches about once every couple of weeks that lasted for a couple of hours. They did not occur with light or noise sensitivity or nausea/vomiting and did not resemble migraine or cluster, but, rather, tension-type headaches. During the October 2010 VA examination, the Veteran stated that his headaches occurred three times per month and lasted all day. He described pain as "head expanding." The Board has considered whether the Veteran is entitled to a separate rating for his headaches pursuant to 38 C.F.R. § 4.124a, Diagnostic Code 8100 (2013). To warrant a compensable rating under Diagnostic Code 8100, there must be evidence of "characteristic prostrating attacks averaging one in 2 months over last several months." Id. While VA regulations do not provide a definition for "characteristic prostrating attacks," Dorland's Illustrated Medical Dictionary (31st ed. 2007), defines "prostration" as "extreme exhaustion or powerlessness." There is no evidence of prostration in the record. During the February 2009 VA examination report, the Veteran stated that his headaches only lasted a couple of hours once every couple of weeks and he took OTC Aspirin or Ibuprofen which relieved his pain. A January 2010 VA treatment record shows that the headaches were described as mild. Therefore, a separate rating for headaches is not warranted. 

Finally, the Board also notes the Veteran's complaints of dizziness. However, there has been no diagnosis ascribed to the symptom and the Veteran has stated that dizziness only occurs sporadically (twice a month) and lasts for a few minutes and resolves spontaneously. Thus, the Board finds that a separate rating is not warranted. Therefore, separate ratings are not warranted for TBI are not warranted.

There is no evidence that the Veteran has lost the use of an extremity, that he has certain sensory impairments or erectile dysfunction, and it is not shown that he needs the aid and attendance of another person to protect him from the hazards of his environment. Therefore, the evidence does not support an award of any type of special monthly compensation.

In reaching its decision, the Board has considered the Veteran's statements regarding his symptoms and functional impairment, as well as the medical evidence in his file, including his medical history. The Board finds that the Veteran is competent to report his functional limitations. However, here, the clinical evidence pertaining to the Veteran's traumatic brain injury is more probative for the purposes of assigning a current rating for the disability at issue in conjunction with the relevant rating criteria - and the Board finds that his functional impairment has been appropriately considered in assigning the current rating consistent with the documented symptoms. Such findings have not been shown to be inconsistent with his documented medical history, including as reported on VA examination in November 2008. To the extent that he may argue or suggest that the clinical data supports an increased disability rating or that the rating criteria should not be employed, he is not competent to make such an assertion. He is also not competent to attribute specific impairments to his traumatic brain injury in contrast to his separately service-connected psychiatric disorder. He has not been shown to have had the requisite medical training to make such a complex finding.

This issue has been reviewed with consideration of whether staged ratings would be warranted. The evidence shows no distinct periods of time when his symptoms have varied to such an extent that a rating in excess of 10 percent would be warranted under any diagnostic code. 38 U.S.C.A. § 5110 (West 2002); 38 C.F.R. § 3.344 (2013); Fenderson v. West, 12 Vet. App. 119 (1999).

The Board finds that the preponderance of the evidence is against the Veteran's claim and the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. The claim is denied.

Extraschedular Consideration

An exceptional or unusual disability picture occurs where the diagnostic criteria do not reasonably describe or contemplate the severity and symptomatology of a veteran's service-connected disability. Thun v. Peake, 22 Vet. App. 111, 115 (2008). If there is an exceptional or unusual disability picture, then the Board must consider whether the disability picture exhibits other factors such as marked interference with employment and frequent periods of hospitalization. Id. at 115-116. When those two elements are met, the appeal must be referred for consideration of the assignment of an extraschedular rating to the Chief Benefits Director or the Director, Compensation and Pension Service, for consideration of an extraschedular evaluation. 38 C.F.R. § 3.321(b) (1) (2013). Otherwise, the schedular evaluation is adequate, and referral is not required. Thun, 22 Vet. App. at 116. 

The Board finds that the Veteran's disability picture is not so unusual or exceptional in nature as to render his disability rating for TBI inadequate. The Veteran's TBI was rated under 38 C.F.R. § 4.124a, Diagnostic Code 8045 (2013), the criteria of which are found by the Board to specifically contemplate the Veteran's level of disability and symptomatology. The Veteran's TBI is manifested by symptoms which satisfy the criteria for impairment level 1 for at least one facet of cognitive impairment, but do not satisfy the criteria for impairment of level 2 or greater in any facet. When comparing that disability picture with the symptoms contemplated by the Schedule, the Board finds that the Veteran's symptoms are adequately contemplated by the disability rating assigned herein for his TBI. A rating in excess of the rating assigned herein is provided for certain manifestations of TBI, but the medical evidence does not show that those manifestations are present. The Board finds that the criteria for a 10 percent rating, for the Veteran's TBI, and the already assigned separate ratings for a mental disorder and tinnitus, reasonably describe the Veteran's disability level and symptomatology and, therefore, the schedular rating assigned herein is adequate and no referral is required. VAOGCPREC 06-96 (1996), 61 Fed. Reg. 66749 (1996); 38 C.F.R. § 4.124a, Diagnostic Code 8045 (2013).


ORDER

An effective date prior to January 21, 2009, for the grant of service connection for residuals of traumatic brain injury is denied.

An initial rating in excess of 10 percent for residuals of traumatic brain injury is denied.



____________________________________________
U.R. POWELL
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs